T.S.I., INC., Plaintiff-Appellee,
Cross-Appellant,

v.

METRIC CONSTRUCTORS, INC.,
Defendant-Appellant,
Cross-Appellee.

No. 86–8218.

United States Court of Appeals,
Eleventh Circuit.

May 14, 1987.

Robert D. Marshall, Jennifer W. Fletcher, Atlanta, Ga., for defendant-appellant, cross-appellee.

J. Richard Dunstan, William G. Guerri, St. Louis, Mo., for plaintiff-appellee, cross-appellant.

Before TJOFLAT and HILL, Circuit Judges, and LYNNE *, Senior District Judge.

* Honorable Seybourn H. Lynne, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

LYNNE, Senior District Judge:

Proceeding as third-party beneficiary of a subcontract between Metric Constructors, Inc. (Metric), and Pro-Tech Corporation (Pro-Tech), dated September 22, 1981, T.S.I., Inc. (TSI), brought suit to recover from Metric [1] the invoice price of barrels of "Thermo-lag" delivered to Metric's job site. The case was referred to a Special Master for a report and recommendation. The Master conducted extensive hearings which appear in the record, and on November 6, 1985, he recommended that judgment be entered in favor of TSI in the amount of $195,480, without prejudgment interest. By order entered February 20, 1986, the district court approved and adopted the Special Master's Findings of Fact and Conclusions of Law in their entirety and directed the entry of a judgment in favor of TSI and against Metric in the recommended amount. Final judgment was entered February 20, 1986, and this appeal ensued. TSI cross-appealed from the disallowance of pre-judgment interest. We REVERSE and REMAND with direction on the direct appeal, and DISMISS the cross-appeal as moot.

## FACTS

TSI is the exclusive manufacturer of spray fireproofing material marketed under the trade name "Thermo-lag". Metric is a building contractor. It was the principal contractor for the construction of a pharmaceutical plant in Augusta, Georgia, for G.D. Searle and Company (owner).

Pro-Tech is an applicator of fire resistant sprayable coatings. Metric entered into a contract with Pro-Tech, dated September 22, 1981, to supply and install spray fireproofing material on such project. In the prime contract, the owner specified Thermo-lag as the chemical fire resistant system to be utilized.

Metric solicited Pro-Tech to submit a bid for applying such materials. Because of

1. Also named as defendants were G.D. Searle and Company and the Richmond County Development Authority, who were dismissed by judgment on the pleadings. Thereafter, the action continued against Metric alone.

Pro-Tech's perilous financial condition, TSI refused to ship such materials on credit. Prior to the signing of the subcontract, Pro-Tech informed Metric that TSI would not agree to supply materials unless one of four alternatives for assuring payment to TSI was adopted: (1) that Metric buy the fire resistant material from TSI and supply it directly to Pro-Tech; (2) that the owner purchase the materials in advance; (3) that Pro-Tech assign to TSI its accounts receivable from Metric for payment for the materials, or (4) that Metric pay for the materials separately by joint check issued to Pro-Tech and TSI.

There were no direct negotiations between TSI and Metric. Pro-Tech acted as an intermediary in seeking an arrangement which would induce TSI to ship the materials on credit. It is undisputed that Metric explicitly rejected alternatives (1), (2), and (3). It informed Pro-Tech that it could communicate to TSI its agreement to insert a joint check provision in the subcontract.[2] Thereafter, through Pro-Tech, TSI proposed the language of such provision which appears in Schedule C of the subcontract as follows:

> PAYMENT OF $405,000.00 FOR FIRE-PROOFING MATERIAL[3] TO BE MADE BY JOINT CHECK TO PRO-TECH AND TSI BASED ON NET 30 INVOICE BILLING FROM TSI TO PRO-TECH. SUPPORTED BY RECEIVING REPORTS FOR MATERIAL BILLED

Also added to the joint check provision at Pro-Tech's request was:

> Material F.O.B. St. Louis, Mo.

After the subcontract was signed by the parties, Pro-Tech commenced performance of the work in November, 1981, and worked through the middle of December, 1981. One shipment of material was received in November, 1981. When it was received, it was counted, signed for, and stored by Metric. This material was paid for by Metric by a joint check to Pro-Tech and TSI in the amount of $66,970, and was based upon an invoice from TSI to Pro-Tech, dated November 16, 1981.

Pro-Tech returned to the project in March, 1981, and subsequently received a joint check from Metric made to the order of Pro-Tech and TSI, dated May 4, 1982, in the amount of $125,795. This check was based upon TSI invoices of March 15, 1982, in the amount of $66,970, and March 30, 1982, in the amount of $58,825. These were the only two checks issued by Metric. No checks were issued by either Metric or Pro-Tech for the shipments of Thermo-lag delivered to the job site on June 9, July 2, and July 23, 1982. Invoices relating to these three shipments aggregated the sum of $195,480.

In late May or early June, 1982, Metric began to be dissatisfied with Pro-Tech's performance. Their relationship deteriorated to the point that Pro-Tech left the job on July 28, 1982, and Metric proceeded to terminate the subcontract and contracted with another applicator to finish the fireproofing.

While Metric took possession of all equipment and material left on the job by Pro-Tech in accordance with Paragraph 21 of the contract, it later demanded that TSI remove such material from the job site, and when TSI declined to do so and the shelf life of the Thermo-lag had nearly or totally expired, Metric took such material to the Richmond County dump for disposal.

## DISCUSSION

We agree that TSI was a third-party beneficiary of the subcontract and had standing to sue for a breach thereof, but we must first determine the obligation as-

---

2. As pertinent, Paragraph 5 of the subcontract between Metric and Pro-Tech provides: "Progress payments may, in the discretion of contractor, be made in the form of checks payable jointly to subcontractor and [supplier of materials]." The effect of the joint check provision was to make mandatory what was theretofore discretionary.

3. Metric's obligation under the subcontract was to pay the lump sum of $405,000 for sufficient subliming material to cover 90,000 square feet. The unit price of $4.50 per square foot was arrived at by dividing $405,000 by 90,000.

sumed by Metric which inured to the benefit of TSI. It seems obvious that if Metric had issued a check for Thermo-lag payable only to Pro-Tech, TSI could have prevailed on a cause of action for breach of the joint check provision. However, that is not this case.

The Master concluded as a matter of law that the joint check provision was ambiguous. Thereupon, he proceeded to receive and consider voluminous parole evidence in an effort to arrive at the intention of the parties with regard to such provision. Strangely enough, in Paragraph 6 of his report, the Master referred to only two of the alternatives proposed by TSI through its intermediary, Pro-Tech, to Metric. He discussed only assignment of accounts receivable and the joint check provision. Then, by circular reasoning, he concluded that the language of the joint check provision which TSI had proposed through Pro-Tech, bound Metric to buy the fire retardant materials from TSI, an obligation which it had flatly refused to assume.

The facts in *Sentry Engineering & Construction, Inc. v. American Olean Tile Company*, 172 Ga.App. 769, 324 S.E.2d 591 (1984), are strikingly similar to those in the case sub judice. We regard any distinctions to be without significant difference. There American Olean Tile Company, Inc. (American), brought an action against Sentry Engineering & Construction, Inc. (Sentry), a general contractor, seeking to recover the balance due for materials sold to C.A. Newman (Newman), a subcontractor. Newman had agreed to install tile in the buildings of the construction project. He subsequently contacted American in order to purchase tile on credit. Having determined that Newman was unworthy of credit, American requested Sentry to enter into a "general contractor's agreement" whereby Sentry would agree to the terms of the sale of the tile to Newman. Sentry refused

to enter into such an agreement. Instead, Sentry wrote a letter to American stating: "Sentry will make joint checks payable to American and Newman for tile furnished for [the project]."

Following the first shipment, Sentry issued a check made payable jointly to Newman and American. Sometime after the second shipment, Newman walked off the job and took the unused tile from the second shipment with him. Sentry issued no further checks made payable to Newman. The court held:

> While we recognize that in some instances contractors do undertake or guarantee the debts of their subcontractors, there was no evidence that [Sentry] did so in the instant case. Instead, [Sentry] merely agreed in a letter to make checks jointly payable to Newman and [American] for materials furnished to the construction site. While the letter agreement did, in fact, give [American] control over such funds as were actually paid by [Sentry] to Newman, it did not evidence an independent agreement by [Sentry] to pay the debts owed by Newman to [American].

172 Ga.App. at 771, 324 S.E.2d at 593.

We reject the Master's tortured construction of the joint check provision;[4] reverse the judgment of the court which imposed upon Metric an obligation which it expressly refused to assume, and remand with direction to enter a judgment for defendant. The cross-appeal is dismissed as moot.

**REVERSED and REMANDED** with direction.

---

4. Nowhere in his report does the Master mention TSI's proposal that Metric buy the material. The undisputed evidence in the record reveals that such proposal was made and rejected by Metric before any material was shipped to the job site for use by Pro-Tech. Yet, the Master concluded that by inserting the joint check provision in the subcontract, Metric intended to buy the material directly from TSI. We are convinced that this flaw in the Master's conclusion and recommendation misled the lower court into imposing upon Metric an obligation which it had clearly expressed its unwillingness to assume.